BRUCE S. HALLIDAY,

        **Plaintiff,**

    v.

GREAT LAKES INSURANCE SE, ET AL.,

        **Defendants.**

**3:18-cv-00072**

TO:   Neil D. Goldman, Esq.
      Alex M. Moskowitz, Esq.

## **MEMORANDUM OPINION**[1]

Before the Court is Plaintiff's Revised Proposed Second Amended Complaint (hereinafter, "Second Amended Complaint" or "SAC"), which the Court construes to be "Plaintiff's Motion for Leave to File Second Amended Complaint" (ECF No. 41).[2]  For the reasons stated below, the Court will grant in part and deny in part Plaintiff's Motion for Leave and deny as moot Wager's Motion to Dismiss.

---

[1] On March 8, 2019, the parties consented to the referral of the case to U.S. Magistrate Judge Ruth Miller for all purposes, and, on March 11, 2019, the matter was so referred.  (ECF Nos. 35, 38).  On June 21, 2019, Judge Miller entered an Order of Recusal (ECF No. 52), and the matter was reassigned to the undersigned for all further proceedings.

[2] The operative docket entry upon which Plaintiff seeks relief is stylized as "Notice of Filing Revised Proposed Second Amended Complaint by Bruce S. Halliday re [ECF] 40 Order on Motion to Amend Complaint." Although there is no accompanying motion, Plaintiff—in his Reply Brief—supplied the Court with proposed orders regarding both the Motion to Dismiss and what he refers to as a "Motion for Leave to Amend" (ECF Nos. 46-1, 46-2).  On page one of Plaintiff's SAC, he references the fact that this filing is in response to Judge Miller's denial without prejudice of his Motion to Amend Complaint.  Further, in a footnote in his Reply Brief, Plaintiff wrote "To the extent necessary, by this Reply, [Plaintiff] renews his Motion for Leave to Amend the Complaint by the Revised Proposed Second Amended Complaint."  (ECF No. 46 at 4 n.2).  The Court is thus on sufficient notice as to the relief sought by Plaintiff.

# I.    BACKGROUND[3]

Plaintiff Bruce S. Halliday (Plaintiff), a citizen and resident of St. Thomas, U.S. Virgin Islands, is the owner of the vessel Kaylara Mai.  SAC (ECF No. 41-2) at ¶¶ 1, 2.  Defendants are (1) Great Lakes Insurance SE, an insurance company based in Munich, Germany (Great Lakes); (2) Wager & Associates, Inc., a Florida corporation "engaged in the business of Yacht Surveying, Insurance Claim Adjusting, and Insurance Claim Management" (Wager); and (3) Concept Special Risks, Ltd. (Concept), a United Kingdom limited company which "provides underwriting and related services to various insurance companies . . . in connection with the insurance of yachts and other vessels."  *Id.* at ¶¶ 3-5.  The Court has federal subject matter jurisdiction over the case, because the matter arises from a marine insurance contract, *see* 28 U.S.C. § 1333.[4]  The Court also has subject matter jurisdiction under 28 U.S.C. § 1332, as the matter in controversy is between a citizen of the United States Virgin Islands (Plaintiff), a citizen of another state within the United States (Wager), and citizens of foreign states (Great Lakes and Concept), and the amount in controversy

---

[3] Only those facts relevant to the instant motions are provided.

[4] District courts of the United States "shall have original jurisdiction . . . of [a]ny civil case of admiralty or maritime jurisdiction . . . ."  28 U.S.C. § 1333(1); *see Piché v. Stockdale Holdings, LLC*, Civ. No. 2006-79, 2009 WL 799659, at *2 (D.V.I. Mar. 24, 2009) ("A claim falls within this Court's admiralty jurisdiction if it satisfies two elements:  location and connection.") (citing *Jerome B. Grubart, Inc. v. Great Lakes Dredge Dock Co.*, 513 U.S. 527, 534 (1995)).  "Since the insurance policy here sued on is a maritime contract[,] the Admiralty Clause of the Constitution brings it within federal jurisdiction."  *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 313 (1955).  Accordingly, this Court has subject matter jurisdiction over this matter pursuant to 48 U.S.C. § 1612(a), which provides the District Court of the Virgin Islands with the same "jurisdiction of a District Court of the United States."  Further, "admiralty law applies to the entire case, not just the claim conferring admiralty jurisdiction."  *Dadgostar v. St. Croix Fin. Ctr.*, Civ. No. 1:10-cv-00028, 2011 WL 4383424, at *4 (D.V.I. Sept. 20, 2011) (citing *Roco Carriers, Ltd. v. MIV Nurnberg Exp.*, 899 F.2d 1292, 1296-97 (2d Cir. 1990)).

exceeds $75,000.

In 2008, Plaintiff began insuring the vessel with Great Lakes. SAC at ¶ 12. He renewed the policy in 2015 and again in 2017. *Id.* at ¶¶ 8, 10. Each time, the policy listed the value of the vessel as $300,000. *Id.* at ¶ 12.

On September 6, 2017, the vessel, which was "berthed and properly tied up at the Sapphire Beach Resort and Marina," was damaged by Hurricane Irma. *Id.* at ¶ 13. Plaintiff notified Great Lakes that the vessel had been severely damaged. *Id.* at ¶ 14. Great Lakes engaged Wager to adjust Plaintiff's claim for damage to the vessel, and on December 19, 2017, Wager issued a preliminary report, estimating the cost to repair the vessel to be $130,000. *Id.* at at ¶¶ 4, 15. On March 13, 2018, Plaintiff provided Great Lakes with a report prepared by Timothy E. Davis of Davis Marine Surveying and Adjusting, which estimated the cost of repairs to be between $319,700 and $320,900, and possibly more than $350,000. *Id.* at ¶ 16. Davis had surveyed the vessel in 2015, and, according to Plaintiff, Great Lakes relied upon Davis' assessment of the vessel's value at that time to determine Halliday's premiums. *Id.* at ¶ 16. On March 19, 2018, Wager notified Halliday that it could not rely upon the 2018 Davis report for purposes of adjusting his claim with Great Lakes. *Id.* at ¶ 17. According to Wager, Plaintiff falsely claimed that, in certain regards, the vessel had been damaged by the storm when in fact the damage was the result of poor maintenance. *Id.* Several weeks later, Wager informed Great Lakes that, in its view, Davis' 2015 survey of the vessel "was misleading and contained false information regarding the vessel's value," because Wager's research indicated that the vessel's selling prices were

far below the estimates. *Id.* at ¶ 18

On June 7, 2018, Great Lakes examined Plaintiff under oath. *Id.* at ¶ 19. Plaintiff alleges that the examination lasted approximately four hours and that the actual purpose of the examinations was to intimidate him or force him to abandon his claims. *Id.* Subsequently, at Wager and Concept's request, Plaintiff provided them with estimates for the repair of the vessel. *Id.* at ¶ 21. Plaintiff filed the instant action on September 5, 2018. Two days later, Great Lakes notified Plaintiff that it considered his policy "void from inception" on the grounds that (1) the vessel was unseaworthy at the time of the storm, (2) Plaintiff misrepresented the vessel's value, and (3) the losses Plaintiff sustained were due to lack of maintenance. *Id.* at ¶ 27 (internal quotation marks omitted).

Plaintiff amended his Complaint as of right on September 27, 2018, asserting claims against Wager for negligence, breach of fiduciary duty, and unfair or deceptive business practices (ECF No. 7-1). Wager filed a Motion to Dismiss on November 8, 2018. Plaintiff filed a response on December 21, 2018. (ECF No. 27). Plaintiff then filed a Motion to Amend Complaint on January 28, 2019 (ECF No. 31), deleting his claims against Wager for breach of fiduciary duty and unfair or deceptive business practices, amending his negligence claim against Wager to assert a claim of gross negligence, and adding a new claim against Wager to assert that Plaintiff is a third-party beneficiary of the contract between Great Lakes and Wager for the adjustment of the claim. U.S. Magistrate Judge Miller denied that motion without prejudice on April 8, 2019, on the grounds that Plaintiff's proposed amended complaint was structured in a way that made it a "shotgun pleading,"

curable by further amendment. (ECF No. 40). Halliday filed the instant motion on April 22,

2019. Wager filed a response, and Plaintiff replied. (ECF Nos. 42, 46). Judge Miller held

oral argument on June 10, 2019. (ECF No. 47). The undersigned asked for supplemental

briefing on July 15, 2019 (ECF No. 53), which the parties then provided (ECF Nos. 54, 55).

## II.     LEGAL STANDARD OF REVIEW

### A.  <u>Leave to Amend</u>

Federal Rule of Civil Procedure 15(a)(2) provides that a party who can no longer

amend a pleading as of right can still amend by obtaining "the opposing party's written

consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Leave to amend the pleadings is

generally "freely given." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Arthur v. Maersk, Inc.*, 434

F.3d 196, 204 (3d Cir. 2006). Notwithstanding this liberal standard, courts will deny a

motion to amend on grounds of dilatoriness or undue delay, prejudice, bad faith, or futility.

*Dole v. Arco Chem. Co.*, 921 F.2d 484, 487 (3d Cir. 1990). "Rule 15(a)(2) places the burden to

make such a showing on the party opposing the amendment." *Price v. Trans Union, LLC*, 737

F. Supp. 2d 276, 279 (E.D. Pa. 2010).

## III.     THE PARTIES' POSITIONS

Plaintiff's claims against Wager are centered on his allegations: (1) that Wager was

negligent, made several false representations, and conducted an overall inadequate

investigation regarding the value of the vessel to Great Lakes, thereby injuring Plaintiff by

causing Great Lakes to declare the policy void; and (2) that Wager breached its obligations

under its contract with Great Lakes ("Adjustment Contract"), thereby injuring Plaintiff, a

third-party beneficiary of that contract.  SAC at ¶¶ 53, 54.

Wager opposes Plaintiff's motion on the grounds that permitting the proposed amendment would be futile.  (ECF No. 42-1 at 1).  First, Wager addresses the choice of law provision found in the policy, arguing that because "[t]here are no 'well established, entrenched principles and precedents of substantive United States Federal Admiralty law' on the issue of whether an adjuster owes any duties to an insured," the Court must, per the policy, apply New York law.  *Id.* at 5.  Next, Wager contends that Plaintiff cannot plead that he was an intended beneficiary of the Adjustment Contract because he cannot plead that he alone could recover for a breach of the contract, as required by New York law.  *Id.* at 6.  In addition, Wager claims that it is "black letter law" that "an insured is not a third-party beneficiary to a contract between an insurer and an independent insurance adjuster hired by the insurer to investigate a loss."  *Id.* at 6 (internal quotation marks omitted).  Finally, Wager argues that it would be futile for Plaintiff to plead negligence under New York law because "adjusters cannot be held liable for work performed on behalf of a disclosed principal as they do not owe the insured any duty."  *Id.* at 7.  Alternatively, without conceding the issue, Wager states that if New York law does not apply, the Court should adopt the majority position that an adjuster owes no duty to the insured.  *Id.* At 8.

In his reply, Plaintiff disputes Wager's suggestion that New York law applies to his claims against Wager.  (ECF No. 46 at 4-5).  According to Plaintiff, the policy's choice of law provision is irrelevant because the counts at issue are made under the common law and the

Adjustment Contract.[5]  *Id.* at 5.  Thus, Plaintiff contends Virgin Islands law governs his negligence claims and, absent a choice of law provision in the Adjustment Contract, also his third-party beneficiary claim.  *Id.*  Lastly, in response to Wager's claim that he failed to identify a specific duty owed him under the adjustment contract, Plaintiff argues that Wager breached the implied covenant of good faith and fair dealing.  *Id.* at 12-13.

## IV.    DISCUSSION

### A.  <u>Choice of Law</u>

Virgin Islands common law governs all of Plaintiff's claims against Wager.  Even though claims on the insurance policy itself might ultimately require the application of New York law, the Court finds no basis to do so at the motion-to-amend stage of this case, because Plaintiff's negligence claims are firmly grounded in tort law.  The Court applies Virgin Islands common law to Plaintiff's negligence claims, because it cannot identify any federal rule governing the construction of a negligence claim brought by an insured against the adjuster of his marine insurance contract.  *See generally Calhoun v. Yamaha Motor Corp., U.S.A.*, 40 F.3d 622, 626-30 (3d Cir. 1994) (discussing the application of state law in the absence of federal admiralty law).

Plaintiff's third-party beneficiary claim against Wager—just like his negligence claims against Wager—are not made under the policy but rather under the Adjustment Contract.  A federal court sitting in diversity applies local law to determine whether a party

---

[5] Neither party provided a copy of the Adjustment Contract.

is a third-party beneficiary to a contract. *See, e.g., Miree v. DeKalb County*, 433 U.S. 25, 28-

29 (1977) (holding that state law determines standing as a third-party beneficiary of a

federal contract where the federal interests involved did not necessitate the application of

federal common law); *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 168 (3d Cir.

2008) (applying state law in diversity case to determine whether plaintiff was third-party

beneficiary of contract and thus had standing to bring breach of contract claim). Without a

copy of the Adjustment Contract stating otherwise, the Court must apply Virgin Islands law

at this stage of the proceedings.

**B.** <u>**Negligence**</u>

The battle at the heart of this motion is whether tort law permits Plaintiff's

negligence claims against Wager or if the lack of privity between the parties is fatal to

those claims. Before the Court can answer that legal question, it must first do some

internal housekeeping to determine whether Plaintiff's claims are grounded on a theory of

ordinary negligence, gross negligence, or both. Plaintiff's proposed amended allegations

read as follows:

<u>COUNT VI NEGLIGENCE (WAGER)</u>

50. Paragraphs 1-32 are repeated and realleged as fully as if restated.

51. Wager's actions as described in paragraphs 15, 17, 20, 21, 22, 23, 24, 26
and 26 above breached his duty of care to the Insured.

52. Wager's acts and omissions as described above were grossly negligent
and undertaken maliciously, and with reckless disregard for the Insured's
rights.

> 53. Wager's gross negligence includes, but is not limited to:
> • His failure to timely and adequately investigate, assess and adjust the damage to the Vessel sustained in the Storm;
> • Misrepresenting the value of the Vessel as being no more than $60,000, and falsely claiming that the Insured misrepresented the value of the Vessel, when the value was based, at least in part, on a survey performed in 2015 by a ACMS certified marine surveyor, requested by the Carrier, and the Carrier wrote in the Policy that the "Agreed Value" of the Vessel was $300,000;
> • Inaccurately claiming that the two doors leading from the walkway on both sides to the aft deck had not blown off as claimed by the insured as alleged in paragraph 17.
> • Inaccurately claiming that the vessel was unseaworthy at the time of the Storm as alleged in paragraph 27.
>
> 54. As a direct and proximate result of Great Lakes' negligence, the Insured sustained damages.

SAC at ¶¶ 50-54. The Court reads Plaintiff's proposed amendments as asserting both theories of gross negligence and ordinary negligence. Although it is not entirely clear as to whether Plaintiff intended to abandon the latter theory, the Count itself is labeled as "Negligence," Paragraph 54 of the SAC uses the term "negligence" and not "gross negligence," and Plaintiff's arguments in his papers seem to shift between both theories. The Court will thus proceed under the assumption that Plaintiff is pursuing both theories of negligence. Consequently, the Court must assess whether Virgin Islands law permits an insurance claimant to bring a cause of action against an adjuster under either theory.

While not entirely a matter of first impression in the Virgin Islands, this Court is tasked with resolving this question anew. In *Banks v. Int'l Rental & Leasing Corp.*, 55 V.I. 967, 969 (V.I. 2011), the Supreme Court of the Virgin Islands held that when precedent is

lacking on a common law rule, courts in the Virgin Islands must conduct what has become

known as a "*Banks* analysis" to determine the applicable law in the Virgin

Islands. A *Banks* analysis requires the balancing of three non-dispositive factors: (1)

whether any U.S. Virgin Islands courts have previously adopted a particular rule, (2) the

position taken by a majority of courts from other jurisdictions, and (3) which approach

represents the soundest rule for the U.S. Virgin Islands. *See Pollara v. Chateau St. Croix*, Civ.

No. SX-06-CV-423, 2016 WL 2865874 at *4 (V.I. Super. 2016) (citing *Government of the V.I.

v. Connor*, 60 V.I. 597, 604 (2014)). The Court will address each factor in turn.

Concerning the first factor, Virgin Islands law is sparse on whether an insurance

adjuster owes a duty of care to a claimant. The only two cases that the Court has identified

on this issue appear to be in direct conflict with each other. In *Francis v. Miller*, 26 V.I. 184,

185 (Terr. V.I. Sept. 6, 1991), the plaintiffs were homeowners who had settled with their

insurance company on a property damage claim stemming from Hurricane Hugo. They

alleged that they were forced into a less-favorable settlement because the insurance

adjuster made several negligent misrepresentations to them and failed to promptly adjust

their claim. *Id.* The Territorial Court concluded that an adjuster—acting as an agent for the

insurance company—could be liable to the plaintiffs if the insurance company was either

undisclosed or if the adjuster exceeded the scope of his authority. *Id.* at 186. The court's

decision was founded upon principles recited in Section 552 of the Restatement of Torts

(Second), which provides:

 (1)   One who, in the course of his business, profession, or employment or in
any other interest, supplies false information for the guidance of others in
their business transactions, is subject to liability for pecuniary loss caused to
them by their justifiable reliance upon the information, if he fails to exercise
reasonable care or competence in obtaining or communicating the
information.

*Francis*, 26 V.I. at 187-88.  Even though the adjuster was not ordinarily in the business of

supplying information, the court found that this Restatement rule provided a sufficient

basis to support the plaintiff's negligence claim.  *Id.*

In 2002, the District Court—sitting in diversity—had an opportunity to tackle the

issue in *Benjamin v. Thomas Howell Grp.*, No. Civ. 1996-071, 2002 WL 31573004, at *4 (D.V.I.

Apr. 22, 2002), *aff'd sub nom. Benjamin v. Accident Ins. Co. of Puerto Rico*, 90 F. App'x 434 (3d

Cir. 2004).  In that decision, Judge Moore concluded that the insurance adjuster did *not* owe

a duty to the plaintiffs, who had alleged that the adjuster was discourteous and

misrepresented their Hurricane Marilyn-related property damage claims to the

insurer.  *Benjamin*, 2002 WL 31573004, at *1.  Judge Moore relied on the Virgin Islands

Insurance Code, which defines an "adjuster" as "any person who . . . investigates or reports

to his principal relative to claims arising under insurance contracts, on behalf solely of either

the insurer or the insured,"  V.I. Code Ann., tit. 22, § 751(a), and an independent adjuster as

"an adjuster representing the interests of the insurer."  *Id.* at § 751(a)(1).  Based on these

definitions, Judge Moore wrote:

The evidence before me shows that [the adjuster] was hired by the
[plaintiffs'] insurance carrier to adjust their claim and that [the adjuster] had
no contractual relationship with the [plaintiffs] regarding their claim against
their insurance carrier.  By statutory definition then, [the adjuster] was an

> independent adjuster who owed its loyalty to the insurer and owed no duty
> to the insured [plaintiffs] regarding their insurance claims.
>
> Moreover, even though a party may have a duty of good faith and fair dealing
> to another, such a duty is limited to those instances where a contract exists.

*Id.* On that basis, Judge Moore granted summary judgment in favor of the adjuster on both negligence and third-party beneficiary breach of contract claims. *Id.* at *2. In a one-word order, the Third Circuit affirmed Judge Moore's decision. *See Benjamin v. Gen. Accident Ins. Co. of Puerto Rico*, 90 F. App'x 434 (3d Cir. 2004).

Neither *Francis* nor *Benjamin* has been adopted or even mentioned by the Supreme Court of the Virgin Islands from what this Court has been able to determine, and it cannot be said that other local courts have considered the issue, much less that *Francis* or *Benjamin* have become an ingrained component of Virgin Islands jurisprudence. Additionally, these cases are of limited utility to addressing Plaintiff's claims, because they leave unanswered the question of whether an adjuster could be liable to a claimant for gross negligence. [6]

---

[6] The Virgin Islands Supreme Court has established that "'the foundational elements of negligence' are: '(1) a legal duty of care to the plaintiff, (2) a breach of that duty of care by the defendant (3) constituting the factual and legal cause of (4) damages to the plaintiff.'" *Coastal Air Transp. v. Royer*, 64 V.I. 645, 651 (V.I. 2016) (quoting *Machado v. Yacht Haven U.S.V.I., LLC*, 61 V.I. 373, 380 (V.I. 2014)). To state a claim for gross negligence, a plaintiff must establish the following elements: "1) the defendant owed plaintiff a legal duty of care; 2) the defendant breached that duty in such a way as to demonstrate a wanton, reckless indifference to the risk of injury to the plaintiff; 3) and defendant's breach constituted the proximate cause of 4) damages to plaintiff." *Brathwaite v.* Xavier, S. Ct. Civ. No. 2017-0037, 2019 WL 3287069, at *11 (V.I. July 16, 2019). The distinction between ordinary negligence and gross negligence in this case might appear to be not all that significant, given that both theories require a plaintiff to demonstrate the existence of a legal duty on the part of the adjuster, but as will be explained *infra*, that duty is not necessarily the same under each theory.

Critical to that question is the scope of gross negligence under Virgin Islands law.

Fortuitously, the Virgin Islands Supreme Court provided guidance on that issue last month.

In *Brathwaite v. Xavier*, 2019 WL 3287069, at *11 (V.I. July 16, 2019), the court said that

gross negligence is equivalent to recklessness and not merely a greater form of ordinary

negligence, aligning the Virgin Islands with the minority of states that have said the same.

The court rejected the majority rule on gross negligence, which recognizes a four-tiered

spectrum of tort liability between (1) ordinary negligence, (2) gross negligence, (3)

recklessness, and (4) intentional wrongdoing, in favor of the minority rule's three-tiered

spectrum, which recognizes only (1) ordinary negligence, (2) gross negligence, and (3)

intentional misconduct. *Id.* at *8. In adopting the more simplified minority rule, the court

looked to various provisions of the Virgin Islands Code that limited professional liability to

only gross negligence for various occupations. *Id.* at *9. The court rejected the notion that

ordinary negligence and gross negligence are merely part of a continuum and, instead,

concluded that they are separate causes of action. *See id.* at *8 ("This approach is also

favorable in that it equates gross negligence with a state of mind—reckless disregard—that

is, at least in theory, *different in quality and not merely degree* from ordinary negligence.")

(quoting *Yusuf v. Ocean Properties, Ltd. & Affiliates*, No. SX-15-CV-008, 2016 WL 9454143, at

*4 (V.I. Super. Mar. 7, 2016) (emphasis added). To succinctly summarize its rationales

underlying the decision, the court wrote:

> "[T]he conception of gross negligence under the minority rule—as equivalent
> with recklessness—is wholly consistent with the large majority of references
> to gross negligence in the Virgin Islands Code. The provisions discussed

above expressly condition either civil liability or professional discipline upon
a finding of gross negligence and specifically foreclose the possibility of
facing such liability or discipline for merely negligent conduct. This suggests
that the Legislature [of the Virgin Islands] intended to allow for the
imposition of such liability or discipline only where the behavior in question
rises to a level of culpability that is categorically different than ordinary
negligence. And as the Superior Court observed in *Yusuf*, 2016 WL 9454143,
at \*4, the minority rule is "favorable in that it equates gross negligence with a
state of mind—reckless disregard—that is, at least in theory, different in
quality and not merely in degree from ordinary negligence."

In light of these considerations, we find no compelling reason, based upon
the statutory usage of the term gross negligence, to adopt the more
complicated and less well-defined four-tiered spectrum of tort liability of the
majority approach. Rather, we are moved by concerns of simplicity and
clarity as outlined both by the Superior Court in *Yusuf*, and by this Court in
the discussion above, to conclude that the minority rule—equating gross
negligence with recklessness—represents the soundest rule of law for the
Virgin Islands. Thus, we hold that in the Virgin Islands, gross negligence
means wanton, reckless behavior demonstrating a conscious indifference to
the health or safety of persons or property. Moreover, we agree with those
courts holding that gross negligence "must be more than any mere mistake
resulting from inexperience, excitement, or confusion, and more than mere
thoughtlessness or inadvertence, or simple inattention." *See Yusuf*, 2016 WL
9454143, at \*4.

*Brathwaite v. Xavier*, 2019 WL 3287069 at \*10. While *Brathwaite* does not address the

issue before the Court today, it nonetheless is informative as an indicator that *Francis* and

*Benjamin* should be persuasive only regarding adjuster liability for ordinary negligence.

With these considerations in mind, the Court turns toward the second *Banks* factor.

The Court notes that most jurisdictions to address this issue have found that a duty of care

does not extend from an insurance adjuster to an insurance claimant. *See, e.g., Lodholtz v.*

*York Risk Servs. Grp.*, 778 F.3d 635, 641 & n.11 (7th Cir. 2015) (predicting the Indiana

Supreme Court would align itself with the "majority rule in American jurisdictions");

*Danielsen v. USAA Cas. Ins. Co.*, Case No. 3:15-cv-00878, 2015 WL 7458513, at *3 (D. Conn. Nov. 24, 2015) ("The Court agrees with the reasoning in these cases, and concludes that the Connecticut Supreme Court would hold that an independent insurance adjuster retained by an insurance company to adjust an insured's claim does not owe a duty of care to that insured"); *Trinity Baptist Church v. Bhd. Mut. Ins. Servs., LLC,* 341 P.3d 75, 84–86 (Okla. 2014) ("Even if harm to the insured through an adjuster's negligence might be foreseeable to the adjuster, from a policy standpoint it makes little sense to hold that the adjuster has an independent duty when the insurer itself is subject to liability for the adjuster's mishandling of claims in action alleging breach of contract and bad faith."); *Hamill v. Pawtucket Mut. Ins. Co.,* 892 A.2d 226, 230 (Vt. 2005) ("[I]n most cases, imposing tort liability on independent adjusters would create a redundancy unjustified by the inevitable costs that eventually would be passed on to insureds.") (citing *Sanchez v. Lindsey Morden Claims Servs., Inc.*, 84 Cal. Rptr. 2d 799, 802-03 (1999)); *Charleston Dry Cleaners & Laundry, Inc. v. Zurich Am. Ins. Co.,* 586 S.E.2d 586, 588–89 (S.C. 2003) ("We decline to recognize a general duty of care from an independent insurance adjuster or insurance adjusting company to the insured, and thereby align South Carolina with the majority rule on this issue"); *Haney v. Fire Ins. Exch.,* 277 S.W.3d 789, 792–93 (Mo. Ct. App. 2009) ("[A] defendant who contracts with another generally owes no duty to contract non-parties, nor can a non-party sue for negligent performance of the agreement."); *Akpan v. Farmers Ins. Exch., Inc.,* 961 So.2d 865, 874 (Ala. Civ. App. 2007) ("[W]e agree with those courts that have refused to find that an independent adjustor or investigator that was hired by an

insurance company to investigate or adjust the claim of one of its insureds owes a duty to

the insured."); *Meineke v. GAB Bus. Servs., Inc.,* 991 P.2d 267, 271 (Ariz. Ct. App. 1999) ("We

conclude that the relationship between adjuster and insured is sufficiently attenuated by

the insurer's control over the adjuster to be an important factor that militates against

imposing a further duty on the adjuster to the insured."); *King v. Nat'l Sec. Fire & Cas.*

*Co.,* 656 So. 2d 1338, 1339 (Fla. Dist. Ct. App. 1995) ("Since Florida law does not recognize a

cause of action by an insured against an independent insurance adjuster in simple

negligence, we affirm the trial court's order granting summary judgment in favor of

appellee.").

   The courts that have embraced the majority rule generally support their decision

with one of two rationales.  First, they say, claimants already have a remedy for

an adjuster's torts through breach of contract and bad faith actions against their

insurers.  *Hamill,* 892 A.2d at 230; *see also Trinity Baptist Church,* 341 P.3d at 86; *Charleston*

*Dry Cleaners,* 586 S.E.2d at 589.  The insurer ultimately is held accountable for even an

independent adjuster's torts, because the insurer "contractually controls the

responsibilities of its adjuster and retains the ultimate power to deny coverage or pay a

claim."  *Hamill,* 892 A.2d at 231.  Thus, if a claimant can recover from the insurer in tort,

then imposing a duty of care on the adjuster "would allow for potential double recovery"

from both the insurer and the adjuster for the same conduct.  *Trinity Baptist Church,* 341

P.3d at 86.  Second, if adjusters had a duty to the claimant, then it could potentially create

"'an irreconcilable conflict between such duty and the adjuster's contractual duty to follow

the instructions of its client, the insurer.'"  *Id.* at 85 (internal citation omitted));

*see Hamill,* 892 A.2d at 231 ("Subjecting adjusters to potential tort liability

from insureds could create conflicting loyalties with respect to the adjusters' contractual

obligations, given that insureds and insurers often disagree on the extent of coverage or the

amount of damages").[7]

Courts in the minority have relied on broad principles of accountability and

foreseeability to support a rule allowing for claimants to make negligence claims against

adjusters.  In *Continental Insurance v. Bayless and Roberts, Inc.*, 608 P.2d 281, 286-87

(Alaska 1980), the Alaska Supreme Court dealt with an insurance claimant who had been

sued after a "paint pot" that it owned had exploded, resulting in the death of its user.  *Id.* at

283-84.  The claimant sued the insurance carrier's subsidiary, which functioned as a claims

department, after the insurer threatened to cease its defense of the claimant unless the

claimant agreed to a reservation of rights.  *Id.* at 287.  The claimant sued the subsidiary and

prevailed after it was determined that the adjuster had failed to adequately investigate the

claim, was not forthcoming about problematic facts during the adjustment process, and

even withheld that the carrier had authorized up to $10,000 to settle the claim.  *Id.* at 293-

---

[7] For a more comprehensive discussion of the policy reasons that state courts have cited when rejecting the existence of an adjuster's duty to the claimant, *see* Steven Plitt & Ryan Sandstrom, *Evaluating the Relationship Between Independent Insurance Adjusters and Insureds: The Case Against Imposing an Independent Duty of Care,* 48 Creighton L. Rev. 245, 261 (2015) ("Courts have identified five principal reasons for rejecting an independent tort: (A) lack of contractual privity; (B) general public policy considerations; (C) imposing an independent duty would create conflicting loyalties; (D) the adjuster is controlled by the insurance company; and (E) the cost of imposing a duty outweighs the benefits.").

94.  The court held that the adjuster "could be liable for negligence arising out of a breach of the general tort duty of ordinary care."  *Id.* at 287.

Six years later, in *Morvay v. Hanover*, 506 A.2d 333, 334-35 (N.H. 1986), the New Hampshire Supreme Court drew a similar conclusion.  There, the claimants' home burned down in a fire, and they sued their insurer's independent investigator who had reported to the insurer that the fire was suspicious, resulting in the denial of the claim by the insurer.  *Id.* at 334-35.  In finding that liability could extend from the investigator to the claimants, the court wrote:

> [T]hey were fully aware that the plaintiffs could be harmed financially if they performed their investigation in a negligent manner and rendered a report to [the insurer] that would cause the company to refuse payment to the plaintiffs. [They] were also aware that there was a mutual duty of fair dealing between [the insurer] and the plaintiffs.  Under these circumstances, we hold that the plaintiffs have stated a cause of action in negligence [against the investigator and the employee.] . . . .
>
> . . . .
>
> Although . . . the investigators may give reports only to the insurer, the insured is a foreseeably affected third party. . . . Both the insured and the insurer have a stake in the outcome of the investigation. Thus, we hold that the investigators owe a duty to the insured as well as to the insurer to conduct a fair and reasonable investigation of an insurance claim and that the motion to dismiss should not have been granted.

*Id.* at 335.

Five years after *Morvay*, the Mississippi Supreme Court took a narrower approach to the minority rule.  In *Bass v. California Life Insurance Co.*, 581 So.2d 1087, 1087 (Miss. 1991), the claimant was denied health coverage for two of her health insurance claims

relating to a foot injury. She sued the third-party administrator that handled her claim,

alleging that the insurer's denial of coverage was based on an erroneous determination

that the claimant's injury diagnosis occurred after her enrollment in the insurance

program. *Id.* at 1088. After the trial court gave a directed verdict to the administrator, the

Mississippi Supreme Court reversed and remanded. *Id.* at 1089. Relying on a previous

Mississippi federal district court opinion, the court said:

> A better approach is the standard placed upon an adjuster/agent in the case
> of *Dunn v. State Farm Fire & Casualty Co.,* 711 F. Supp. 1359 (N.D. Miss.
> 1987). In *Dunn,* an adjuster filed a motion to dismiss claiming that
> Mississippi law provided no cause of action for breach of a fiduciary duty or a
> duty of good faith. In ruling that no cause of action existed under the facts of
> that case, the district court explained that an adjuster could be deemed liable
> to an insured for gross and reckless negligence. That court stated:
>
>> The relationship between an adjuster and the insured is a
>> purely contractual one. The adjuster does not owe the insured
>> a fiduciary duty nor a duty to act in good faith, as the plaintiff
>> claims.
>>
>> An adjuster has a duty to investigate all relevant information
>> and must make a realistic evaluation of a claim. However, an
>> adjuster is not liable for simple negligence in adjusting a
>> claim. He can only incur independent liability when his
>> conduct constitutes gross negligence, malice, or reckless
>> disregard for the rights of the insured.
>>
>> *Dunn,* 711 F. Supp. at 1361.
>
> After consideration of the above jurisprudence, we find that *Dunn v. State
> Farm Fire & Casualty Co.,* provides the better standard for an
> adjuster/administrative agent such as VPA. This Court is hesitant to hold
> adjusters, agents or other similar entities to a standard of
> ordinary negligence. We will, however, hold them to a standard of care
> consistent with *Dunn, supra.*

*Bass,* 581 So. 2d at 1090 (other internal citations omitted).

As to third prong of *Banks*, the Court determines that the best approach for the

Virgin Islands is to strike a compromise within the boundaries of the majority and minority

rule. Consistent with *Brathwaite* and *Benjamin*[8] and with persuasion from *Bass*, the Court

today determines that insurance claimants have a common law cause of action against

insurance adjusters for gross negligence but are categorically barred from bringing claims

against adjusters for ordinary negligence.

The Court arrives at this decision, in part, through a technical application of the

rules that emerged from these three cases. *Brathwaite* states that ordinary negligence and

gross negligence are two distinct causes of action under Virgin Islands law. *Benjamin* states

---

[8] At first glance, *Benjamin* seems to carry more weight, because it is more recent, more specific, and, perhaps, even a little more on point. Though a one-word affirmance in an unpublished court of appeals opinion hardly makes *Benjamin* a binding precedent, it nonetheless cannot be entirely ignored that, unlike *Francis*, *Benjamin* has been subject to appellate review—at least from what the Court has gathered.

One of the factors giving the Court some hesitation in affording more weight to *Benjamin* is that it is not a pronouncement of a local Virgin Islands court but rather a pronouncement by *this Court* as to what the *local* law of the Virgin Islands must have been at that time. By 1991, when *Francis* was decided, the Legislature enacted a statute divesting this Court of original jurisdiction. *See, e.g., Parrott v. Gov't of the Virgin Islands*, 230 F.3d 615, 619 (3d Cir. 2000). The jurisdiction of this Court then became "equivalent, at least in the civil context, to that of a United States District Court." *Club Comanche, Inc. v. Government of the Virgin Islands*, 278 F.3d 250, 256 (3d Cir. 2002). Consequently, the Territorial Court could have—at least in theory—addressed questions regarding local Virgin Islands law that this Court may never have had the opportunity to do—at least not as a trial court.

Furthermore, *Benjamin* was decided by this Court pursuant to its diversity jurisdiction rather than its appellate jurisdiction. *See Benjamin*, 2002 WL 31573004, at *1. The distinction may be subtle, yet it is important for purposes of comity and appropriate recognition of local precedent. The *Benjamin* decision would not have been binding on the Territorial Court—or even this Court—at that time. Like the *Benjamin* Court, this Court is a federal district court addressing a territorial common law issue under this Court's diversity jurisdiction. The fact that the *Benjamin* Court was applying local law and did not even attempt to distinguish *Francis* makes its conclusions even more suspect, even if they might ultimately be correct. For purposes of comity, it could be the case that *Benjamin* is no more relevant to this case than is *Francis*.

that Virgin Islands law does not permit insurance claimants to sue adjusters for ordinary negligence. *Bass* also states that claimants cannot sue adjusters for ordinary negligence but differs from *Benjamin* in that it permits claimants to sue adjusters for gross negligence. This Court finds additional support in the *Brathwaite* decision, because Mississippi is one of the states that uses the gross negligence standard that was ultimately adopted by the Virgin Islands Supreme Court. *See Brathwaite*, 2019 WL 3287069, at *7 ("Gross negligence is that course of conduct which, under the particular circumstances, discloses a reckless indifference to consequences without the exertion of any substantial effort to avoid them.") (quoting *W. Cash & Carry Bldg. Materials, Inc. v. Palumbo*, 371 So.2d 873, 877 (Miss. 1979)).

Further, as discussed in *Brathwaite*, the Virgin Islands Code contains numerous examples of instances where the Legislature has categorically exempted certain classes of individuals from ordinary negligence but not for gross negligence. *See, e.g.,* V.I. Code Ann., tit. 29, § 87(d) (stating that "Board members of the Virgin Islands Housing Authority or the Virgin Islands Housing Finance Authority, while acting within the scope of their duties as board members, shall not be subject to personal or civil liability resulting from the exercise of any of the Authority's purposes, duties or responsibilities, unless the conduct of the member is determined by a court of competent jurisdiction to constitute willful wrong doing or gross negligence."); V.I. Code Ann., tit. 32, § 202(h) ("The member of the Virgin Islands [Horse Racing] Commission while acting within the scope of their duties as members of such Commission, shall not be subject to any personal or civil liability as a result of any of the Commission's actions taken pursuant to its duties and responsibilities,

unless the conduct of the member or members is determined by a court of competent

jurisdiction to constitute willful wrongdoing or gross negligence."); V.I. Code Ann., tit. 29, §§

556(c)-(d) ("No judgment may be rendered against the [Virgin Islands Port] Authority in

excess of $75,000 in any suit or action against the Authority with respect to any injury to or

loss of property or personal injury or death that is caused by the negligent or wrongful act

or omission of an employee of the Authority while acting within the scope of the

employee's employment" but not "if the injury, loss of property or death is caused by the

gross negligence of an employee of the Authority while the employee is acting within the

scope of employment."); V.I. Code Ann., tit. 29, §§ 500(c)-(d) (stating roughly same

standard for Waste Management Authority as for Port Authority); V.I. Code Ann., tit. 32, §

84(d) ("Members of the St. Croix Park Authority, while acting within the scope of their

duties as members of the Authority, shall not be subject to any personal or civil liability

resulting from the exercise of any of the Authority's purposes, duties or responsibilities,

unless the conduct of the member is determined by a court of competent jurisdiction to

constitute willful wrongdoing or gross negligence.").

 Limitations on liability—whether established by narrowing the duty owed or by

restricting the types of negligence for which an actor may be liable—are not solely limited

to statutes but are also found at common law. Even in very early English common law, it

was recognized that holding persons to a general duty of care in all situations was

unsustainable. *See* W. PAGE KEETON ET AL., PROSSER & KEETON ON TORTS § 53, at 357-

58 (5th ed. 1984) ("[I]t should be recognized that "duty" is not sacrosanct in itself, but is

only an expression of the sum of total of those considerations of policy which lead the law

to say that the plaintiff is entitled to protection.").  This concept of a narrower duty

received traction in early 20th-century American courts that found that drivers could be

liable to guests in their vehicles only for injuries resulting from gross negligence:

> That opinion (*Heiman v. Kloizner*, 247 P. 1034 (Wash. 1926)) does not
> definitely fix the degree of lack of care which must be shown by an invited
> guest before liability will result.  It holds that that degree is somewhere
> between that required where the carriage is one for hire and that necessary
> to be exercised with reference to the safety of a mere trespasser. From that it
> must follow that before an invited guest can recover, a showing of gross
> negligence is necessary.

*Saxe v. Terry*, 250 P. 27, 28 (Wash. 1926), *overruled by Roberts v. Johnson*, 588 P.2d

201 (1978).  Courts have also found that landowners can be liable to persons on the

land only for recklessness but not for ordinary negligence:

> The duty owed in a premises liability case is that the landowner simply owes
> the licensee a duty to warn of unreasonably dangerous conditions, when the
> licensee neither knows nor has reason to know of the condition and the risk
> involved.  *Whereas, the duty owed in a general negligence claim* is that every
> person who engages in the performance of an undertaking has an obligation
> to use due care or to act so as not to unreasonably endanger the person or
> property of another.

*Jahnke v. Allen*, 865 N.W.2d 49, 51 (Mich. App. 2014) (emphasis added) (internal citations

omitted).  Judicially crafted limitations on liability have also been applied to torts in

recreational sports, where courts have been careful to allow for liability only when

participants engage in severe conduct:

> Vigorous participation in athletic competition is a public policy to be
> encouraged.  *See Hackbart v. Cincinnati Bengals, Inc. and Charles "Booby"*
> *Clark,* 601 F.2d 516 (10th Cir. 1979); *Oswald v. Township High School District*

> *No. 214,* 406 N.E.2d 157 (Ill. App. 1980); *Ross v. Clouser,* 637 S.W.2d 11
> (Mo.1982); *Kabella v. Bouschelle,* 672 P.2d 290 (N.M. Ct. App. 1983). "Fear of
> civil liability stemming from negligent acts occurring in an athletic event
> could curtail the proper fervor with which the game should be
> played." *Ross,* 637 S.W.2d at 14.
>
> However, we also recognize that "organized, athletic competition does not
> exist in a vacuum." *Nabozny [v. Barnhill],* 334 N.E.2d at 260. Where, as in the
> present case, the participants are engaged in an adult competition governed
> by a set of rules, and when the participants know or should know the rules
> and understand the rules serve to protect the participants, then each player
> has a duty to the next to comply with those rules. "A reckless disregard for
> the safety of other players cannot be excused." *Id.* at 261.
>
> We are also mindful that adopting a mere negligence standard could lead to
> an overabundance of litigation. In a sport, such as hockey, where some risk
> of injury is inherent in the nature of the game, litigation should not
> potentially follow every time a participant negligently causes injury. "If
> simple negligence were to be adopted as the standard of care, every punter
> with whom contact is made, every midfielder high sticked, every basketball
> player fouled, every batter struck by a pitch, and every hockey player tripped
> would have ingredients for a lawsuit if injury resulted.

*Archibald v. Kemble*, 971 A.2d 513, 518 (Pa. Super. Apr. 23, 2009). Mississippi courts that

have applied *Bass* have characterized that case as one setting forth a similar bright-line

distinction. *See, e.g., Russell v. New York Life Ins. Co.*, No. 3:98CV006-D-A, 1997 WL 170317,

at *4 (N.D. Miss. Mar. 4, 1997) ("[I]t appears that the court raised the standard under which

an agent may be held personally liable in tort and excluded individual liability based on

mere negligence."); *Gallagher Bassett Servs. v. Jeffcoat*, 887 So.2d 777, 783 (Miss. 2004)

("[An adjuster] may be held independently liable for its work on a claim if and only if its

acts amount to any one of the following familiar types of conduct: gross negligence, malice, or reckless disregard for the rights of the insured.").[9]

Following suit, this Court makes its own determination today that adjusters in the Virgin Islands should not be held accountable to a claimant in ordinary negligence for something as simple as a missed call or an honest error during the adjustment process. Imposing that kind of liability on adjusters could create a significant burden on the insurer-adjuster relationship and likely deter adjusters from taking action that would promptly resolve claims.

The principles set forth in *Bass* best illustrate that adjuster liability does not have to be an all-or-nothing proposition. *Bass* created a regime where adjusters owe a duty of care to claimants for egregious actions that constitute gross negligence but did not go so far as *Conner* or *Morvay*, which created broader liability for adjusters. The *Bass* rule is workable in that it limits interference in the insurer-adjuster relationship and allows adjusters to retain mostly free reign to operate within their contractual boundaries, but at the same time creates a check on an adjuster's power. "[J]urisprudence should not be in the position of approving a deliberate wrong," *Bass*, 581 So.2d at 1090, and a claimant should have recourse against an adjuster who operates in a manner that undermines the integrity of an insurance claim adjustment or sabotages what otherwise might be a legitimate claim.

---

[9] *See also* PROSSER & KEETON ON TORTS, § 34, at 211 ("[T]he idea of degrees of negligence, or at least of some kind of aggravated negligence which will result in liability where ordinary negligence will not, has been adopted in a number of *judicial opinions* and statutes.") (emphasis added).

Indeed, the type of conduct that could constitute gross negligence on the part of the adjuster might not even create liability for the insurance company. An adjuster should not be able to cloak itself as an agent of the insurer for such behavior. To do so could potentially erode the public's faith in the private insurance process.

The approach adopted by the Court today has also found support in academic circles. Indeed, Professor Stempel explained that courts' unwillingness to find a balance between the majority rule and minority rule is the prime reason that the issue remains contentious:

> The failure of the traditional jurisprudence, in my view, is not its presumptive insistence on contract privity or its respect for the disclosed principal rule of agency. The historical approach has become problematic, not because of the contract underpinnings of the bad faith tort, but because too many courts and litigants have seen adjuster liability as an all-or-nothing proposition. Either the adjuster is liable in bad faith, or the adjuster is immune. There is an intermediate position. The adjuster should ordinarily be protected from imputed liability due to an insurer's misconduct, but the adjuster should be liable for negligence (or certainly for more egregious misconduct such as gross negligence or recklessness) based on basic tort principles and overarching agency axioms that overcome the protection provided by the disclosed principle rule.

Jeffrey W. Stempel, *The "Other" Intermediaries: The Increasingly Anachronistic Immunity of Managing General Agents and Independent Claims Adjusters*, 15 Conn. Ins. L.J. 599, 618 (2009).

A private adjuster's responsibilities are generally aligned to satisfy the insurance carrier, meaning that the adjuster will often do whatever it can to generate the lowest possible payout on a claim. *See* ROBERT E. KEETON & ALAN I. WIDISS, INSURANCE LAW §

3.10, at 825 (1988). The adjuster's incentives under such an arrangement can have

catastrophic consequences for the insured. As a rational market actor, an adjuster knows it

could lose business with a carrier if claim payments are too high. While claimants often can

anticipate that the adjuster will not be completely disinterested, a different problem

emerges when the adjuster intentionally conceals information that the claimant might

never know about. Outdated principles regarding privity of contract ultimately have no

way of pragmatically addressing that reality. As Professor Stempel wrote:

> Although [managing general agents] and independent adjusters may not
> have formal contract relations with policyholders or others involved in the
> transaction, these intermediaries in essence assume the role of the insurer in
> addressing loss claims. Under these circumstances, courts have been too
> slow to realize that intermediaries playing this role have also in essence
> stepped into the shoes of the insurer for these claims and thus logically
> should be held to the same legal standards governing the insurer. In these
> cases, both policyholders and other reasonably foreseeable third party
> claimants should be able to bring claims if injured by the misconduct of the
> intermediary/insurer.

Stempel, 15 Conn. Ins. L.J. at 624. The Court does not go as far today as Professor Stempel

suggests it should, but it accepts his recognition of the shortcomings of traditional tort law

to address the modern insurance industry. His apprehensions figure considerably into this

Court's decision today.[10]

---

[10] For an excellent opinion echoing some of Professor Stempel's concerns, the Court also takes notice of a recent Iowa Supreme Court case addressing a slightly different question than the one before the Court today. In *De Dios v. Indem. Ins. Co. of N. Am.*, 927 N.W.2d 611, 635 (Iowa May 10, 2019), the court concluded that Iowa law did not recognize a claim of bad faith against a third-party claims administrator in a workers' compensation case. However, Justice Brent Appel's dissent provided great insight as to the economic realities of the insurance process that exists today:

To reiterate, the Court upholds principles of both the majority and minority rules.

The Court finds great persuasion in the reasons underlying the majority rule: irreconcilable

---

> Another factor that drives me toward the conclusion that the tort of bad faith liability for insurance intermediaries should be recognized is the perverse incentives that can arise from the relationship between the insurer and the intermediary. The insurance company hires an intermediary to save money, of course. The intermediary will desire to maintain or strengthen its business, and that can be done by limiting claims payouts. Further, in order to be competitive, the insurance intermediary may resist proper claims handling and instead choose to arbitrarily limit its staff, thereby encouraging shortcuts in the claims process. Further, through use of a third-party intermediary, an insurer may maintain a warm public relations posture while intentionally employing a third-party administrator with the expectation that its agent will limit payouts through whatever means the agent might consider effective. These risks are further enhanced when compensation arrangements contain incentives that increase payouts as claims liability lessens. The interests of the insured do not figure into the financial equation, or at least not in a positive way.

*Id.* at 633.

Ultimately, Justice Appel concluded that limitations on adjuster liability generate unsound public policy and diminish the overall quality of the insurance claims process:

> In conclusion, one of the features of life in the 21st century is the increased bureaucratization and compartmentalization of business practices that, if accepted as legal barriers, tend to prevent direct accountability for wrongful conduct. Layers upon layers of bureaucracy impair responsiveness.
>
> ...
>
> But where there is no direct accountability, service may deteriorate. We all know the potential scenario. The phone rings and no one answers. One is put on hold for hours. The right hand knows not what the left hand is doing. No one is familiar with the file. A person with decision-making authority cannot be found. Delay. Delay. Delay. This type of behavior could lead to bad-faith exposure of an insurance company.
>
> ...
>
> I can think of no other area where it is more critical to have direct accountability than in insurance—where issues of extraordinary importance and urgency to the insured are increasingly handled by faceless and insulated third-party bureaucracies. To me, one of the essential functions of our tort system is to ensure that parties responsible for the foreseeable injuries that they cause through their misconduct, particularly those done in bad faith, are held directly accountable.

*Id.* at 635.

conflicts, the possibility of double recovery, and the concern that increased exposure to liability will result in higher costs to the consumer. However, the minority rule creates incentives for fair play during the adjustment process. Further, it allows a claimant to potentially recover damages for a whole category of conduct on the part of the adjuster that might not be available if the claimant were to sue only the insurer.[11] As such, the Court finds that the best approach for the Virgin Islands is to split the baby. The Court finds the majority rule applicable to Plaintiff's ordinary negligence claim and the minority rule applicable to Plaintiff's gross negligence claim.

Accordingly, the Court will deny Plaintiff leave to amend to add his ordinary negligence claim. However, Plaintiff has alleged facts that, if true, would support his claim for gross negligence. Thus, the Court grants Plaintiff leave to amend on that theory.

**B.** **Third-Party Beneficiary**

To demonstrate intended beneficiary status, the Virgin Islands Supreme Court has said that:

> [T]he third party must show that the contract reflects the express or implied intention of the parties to the contract to benefit the third party. [When reviewing such a claim, the court] examine[s] the terms of the contract as a whole, giving them their ordinary meaning. The contract need not name a beneficiary specifically or individually in the contract; instead, it can specify a class clearly intended by the parties to benefit from the contract.

---

[11] *See* Stempel, 15 Conn. Ins. L.J. 599, 669 ("[U]nder the (admittedly rare) right set of circumstances, the adjuster might logically be held liable for *tortuous conduct outside of the terms of the insurance policy*, just as many jurisdictions permit recovery for bad faith treatment even when coverage did not exist or was doubtful.") (emphasis added). *See also* PROSSER & KEETON ON TORTS § 70, at 505-06.

*Petrus v. Queen Charlotte Hotel Corp.*, 56 V.I. 548, 555-56 (2012) (quoting *GECCMC 2005-C1*

*Plummer St. Office Ltd. Partnership v. JPMorgan Case Bank, Nat. Ass'n*, 671 F.3d 1027, 1033

(9th Cir. 2012)) (internal citations and quotation marks omitted); *see also Moorhead v. V.I.*

*Ground Handlers, Inc.*, 1996 WL 35048106, at *2 (Terr. V.I. Oct. 18, 1996).

In this regard, Plaintiff alleges as follows:

<u>COUNT VIII[12] THIRD PARTY BENEFICIARY OF CONTRACT BETWEEN
CARRIER AND WAGER (WAGER)</u>

60. Paragraphs 1-32 of this complaint are repeated and realleged as fully as if restated.

61. The Insured was an intended or incidental beneficiary of the contract by which Carrier engaged Wager to adjust the Insured's claim (the "Adjustment Contract").

62. Wager breached its obligations under the Adjustment Contract by its actions as described in this Complaint. As a direct and proximate result of those breaches, the Carrier has, at the instigation and urging of Wager, improperly claimed that the Policy is void, and that the Insured is not entitled to recovery for damages which are properly payable under the policy, and for other relief under the policy.

63. As a direct and proximate result of Wager's breaches of his contract with the Carrier of which the Insured is a third party beneficiary, the Insured has sustained damages in an amount to be determined by the Court.

Wager contends that these allegations—regardless of which jurisdiction's law

applies—are insufficient, because they do not establish any intent between Wager and

Great Lakes to benefit Plaintiff. Particularly, Wager argues that Plaintiff's allegations are

---

[12] Plaintiff labeled this Count as Count VII in his SAC, but because he provided two Count VI's, the Court will refer to this Count as Count VIII.

conclusory and that, as a matter of law, an insurance claimant cannot possibly be a third-party beneficiary to a contract between an insurer and an adjuster. (ECF No. 42-1 at 5-6). Wager asks for more than is required of Plaintiff at this stage of the proceedings. To begin, despite any lack of proof, it is highly plausible to infer that Wager and Great Lakes entered into the Adjustment Contract between them governing Wager's services—indeed, it is implausible to infer otherwise. Next, it is likewise plausible that the Adjustment Contract had the sorts of terms that would indicate that Great Lakes procured Wager's services to adjust Plaintiff's insurance claim.

Wager contended at oral argument that Plaintiff is, at best, an incidental beneficiary of the Adjustment Contract and that Wager—as an agent of Great Lakes—can serve only Great Lakes as its master. But, because "[t]he underlying question of whether someone is a third-party beneficiary to a contract is a mixed question of law and fact," *Sanchez v. Innovative Tel. Corp.*, Civil No. 2005-45, 2007 WL 4800351, at *2 (D.V.I. Nov. 30, 2007), making such a determination now—especially without actually viewing the Adjustment Contract—would be inappropriate. Further, the *Francis* case specifically states that "an agent may be personally liable in contract when he acts on behalf of an undisclosed principal or *exceeds the scope of his authority*." *Francis*, 26 V.I. at 186 (emphasis added). While Plaintiff was aware of the principal—Great Lakes—the allegations within the SAC are consistent with the notion that Wager acted well beyond what Great Lakes authorized it to do.

Although Plaintiff does not specify the source of Wager's breach of the Adjustment

Contract, Plaintiff's counsel clarified at oral argument that this allegation was predicated on

the breach of the implied covenant of good faith and fair dealing. Because that duty is

baked into every contract, the Court will not require Plaintiff to further amend the

Complaint to make that point. *See Chapman v. Cornwall*, 58 V.I. 431, 441 (2013) ("[T]he

implied duty of good faith and fair dealing arises by implication through the existence of a

contract itself."); *see also* Restatement (Second) of Contracts § 205 ("Every contract

imposes upon each party a duty of good faith and fair dealing in its performance and its

enforcement."). A duty of good faith prohibits each party from "act[ing] unreasonably in

contravention of the other party's reasonable expectations. A successful claim . . . requires

proof of acts amounting to fraud or deceit on the part of the employer." *Chapman*, 58 V.I. at

441 (citing *Francis v. Pueblo Xtra Intern., Inc.*, 412 F. App'x 470, 475 (3d Cir. 2010)); *see*

*also Pennick v. V.I. Behavorial Serv.*, D.C. Civ. App. No. 2006-0060, 2012 WL 593137, at *3

(D.V.I. Feb. 22, 2012)).

For these reasons, the Court will grant Plaintiff leave to amend to assert a third-

party beneficiary claim against Wager.[13]

---

[13] A further *Banks* analysis on this Count might be required, but for now the Court sees it prudent to allow Plaintiff to make this amendment. As Plaintiff points out, unlike in *Benjamin*, where the Court "appears not to have considered a third-party beneficiary claim in evaluating the claim that the adjuster breached its duty of good faith and fair dealing," here "the third-party beneficiary claims have been expressly pled…[o]n the current record, it cannot be said that the agreements between Carrier and Wager preclude the Insured's claim to be an intended third-part beneficiary of those agreements." (ECF No. 55 at 3-4). The Adjustment Contract might ultimately reveal that Plaintiff is not an intended third-party beneficiary, but in the absence of any language confirming as much, the Court can only rely on basic assumptions as to what that agreement *might* contain.

## V.     CONCLUSION

Based upon the foregoing, the Court will **GRANT IN PART and DENY IN PART** Plaintiff's Motion for Leave to File Second Amended Complaint (ECF No. 41).  The Court will **GRANT** Plaintiff leave to amend 1) Count VI to add a gross negligence claim and 2) Count VIII to add a third-party beneficiary claim.  The Court will **DENY** Plaintiff leave to amend 3) Count VI to add an ordinary negligence claim.  The Court will also **DENY** as **MOOT** Wager's Motion to Dismiss (ECF No. 23).  An appropriate Order accompanies this Memorandum Opinion.

ENTER:

Dated: August 1, 2019

/s/ George W. Cannon, Jr.
GEORGE W. CANNON, JR.
MAGISTRATE JUDGE